# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Douglas A. Kelley, in his capacity as
the Trustee of BMO Litigation Trust,

                              Plaintiff,

vs.

BMO Harris Bank N.A., as successor
to M&I Marshall and Ilsley Bank,

                              Defendant.

Case No. 19-cv-1826-WMW

Judge Wilhelmina M. Wright


**Plaintiff's Memorandum of Law in Opposition to BMO Harris's
Motion for Leave to Appeal Order on Motion for Summary Judgment**

**Introduction**

BMO's appeal of the Bankruptcy Court's Summary Judgment Order should be denied because it fails to meet the requirements of 28 U.S.C. § 158(a) for granting an interlocutory appeal. Chief Judge Sanberg transferred this case to the District Court on July 2, 2019, because it is **trial ready**. Nevertheless, as it has done for nearly three years after Judge Sanberg took over the case, BMO seeks further delay by this motion for leave to appeal and its motion to stay. BMO fears a trial on the merits, especially in light of the Bankruptcy Court's sanctions order of July 1, 2019. At this advanced stage of the litigation, this Court should not countenance BMO's delay tactics.

This is now the third time that BMO has sought to dismiss the case based on its standing and *in pari delicto* arguments. The Bankruptcy Court rejected BMO's arguments at the motion to dismiss stage on February 24, 2017, and rejected those same arguments again in the Summary Judgment Order of June 27, 2019. Both orders included a careful analysis of Minnesota law on standing and *in pari delicto* and should not be disturbed. The Court should not waste time and resources rehashing arguments thoughtfully considered and ruled on twice by the Bankruptcy Court.

This is not an exceptional case and does not satisfy the § 158(a) standards.

**The appeal does not involve a controlling question of law as to which there is a substantial basis for difference of opinion.**

First, BMO alleges a conflict between the Bankruptcy Code and Minnesota law. There is no such conflict because § 541(a) of the Code provides that an estate includes causes of action, which are governed by state law.[1] BMO does not and cannot argue that there is a conflict in Minnesota law on the issues of standing and *in pari delicto*.

The Bankruptcy Court's ruling on standing is soundly based on Minnesota law: "Thus, under Minnesota law, Defendant has failed to show as a matter of law that Plaintiff lacks standing to pursue direct claims for harm to PCI because of its inability to pay creditors."[2] Nor did BMO cite any Minnesota authority to show that the trustee lacked standing to assert the estate's derivative claims.[3]

Similarly, the Bankruptcy Court stated that "[d]efendant does not cite any controlling Minnesota or Eighth Circuit case law providing that *in pari delicto*

---

[1] *Mehlhaff v. Allred (In re Mehlhaff)*, 491 B.R. 898, 900-02 (B.A.P. 8th Cir. 2013).

[2] Order Denying Def.'s Mot. Summ. J. ("SJ Order") at 11 (June 27, 2019) (Case No. 19-1756, ECF No. 15-17).

[3] *Id.* at 14 ("Under *Medtronic, Greenpond,* and established Minnesota law, the Court finds that Defendant has failed to show as a matter of law that Plaintiff lacks standing to pursue derivative claims on behalf of the estate for harm to PCI's creditors by virtue of their status as 'creditors.'").

became available once a receivership entity is placed into bankruptcy."[4] The

Eighth Circuit Court of Appeals has in the past dismissed an interlocutory

appeal because "the section 1983 'legal issue [is] not novel, nor is there a

substantial basis for difference of opinion, as the law is relatively well-

settled . . . .'"[5] Here, the issues are not novel. Minnesota law on standing and *in*

*pari delicto* is well settled, and there is no conflict between the Bankruptcy Code

and Minnesota law.

BMO has not cited any applicable new authority in its motion to rebut the

Bankruptcy Court's rulings, which were based on established Minnesota

precedents. Because there is no "substantial basis for a difference of opinion" in

Minnesota law on these issues, Defendant's motion should be denied.

Judge Sanberg also ruled, in the alternative, that *in pari delicto* was a

question of material fact.[6] The Bankruptcy Court's order is fact intensive, and

"review is not proper under § 158(a)(3)."[7] Thus, there is no controlling question

---

[4] *Id.* at 16.

[5] *S.B.L. ex rel. T.B. v. Evans*, 80 F.3d 307, 321 (8th Cir. 1996).

[6] SJ Order at 17.

[7] *Bremer Bus. Fin. Corp. v. Dorsey & Whitney, LLP (In re SRC Holding Corp.)*, Civ. No. 06-2768, 2006 U.S. Dist. LEXIS 95217, at *3 (D. Minn. Feb. 7, 2006) (citing *Hanson v. United States (In re Hanson)*, Civ. Nos. 03-5592, 03-6362, 2004 U.S. Dist. LEXIS 12258, at *9 (D. Minn. July 1, 2004)).

of law.

**Refusal would not result in wasted litigation and expense.**

Second, BMO argues the cost of trial will be avoided by granting leave to appeal, but the trial costs are minimal compared to the tens of millions of dollars already spent on discovery and motion practice by the parties—much of it caused by BMO's obfuscation and discovery abuses.[8] BMO could have sought leave to appeal the February 24, 2017 rulings on standing and *in pari delicto*, long before the parties engaged in extensive discovery and motion practice. Instead, it chose a "scorched earth" defense that cost millions. At this point in the litigation, BMO's claim of "cost savings" is specious.

**An immediate appeal would not materially advance the ultimate termination of the litigation.**

Third, this case is trial ready, and any appeal would only increase the costs and delay the resolution of the litigation. As Judge Tunheim noted in *Hartley v. Suburban Radiologic Consultants, Ltd.*: "[t]he Court cannot ignore the possible deleterious impact on the litigation - in terms of both expense and delay – if the

---

[8] "Throughout discovery, the Court reprimanded [BMO] for willful discovery violations and warned Defendant about its aggressive discovery and delay tactics." Order Granting Plaintiff's Motion for Rule 37 Sanctions for Defendant's Spoliation of Evidence at 2 (July 1, 2019) (Case No. 19-1756, ECF No. 15-19).

Eighth Circuit was to affirm this Court's denial of summary judgment."[9]

Because BMO's motion fails to meet the § 158(a) requirements, it should be denied, and Plaintiff respectfully requests that the Court set a trial date.

## Argument

### I.   Interlocutory appeals standards

BMO appeals from the Bankruptcy Court's denial of summary judgment pursuant to 28 U.S.C. § 158(a)(3).[10] That section provides that district courts "have jurisdiction to hear appeals . . . , with leave of court, from interlocutory orders and decrees, of bankruptcy judges . . . ." The movant "must demonstrate that exceptional circumstances exist."[11]

The movant must show the following exceptional circumstances: "(1) refusal would result in wasted litigation and expense; (2) the appeal involves a controlling question of law as to which there is a substantial basis for differences of opinion; and (3) an immediate appeal may materially advance the ultimate

---

[9] Civ. No. 11-2664, 2013 U.S. Dist. LEXIS 174943, at *9 (D. Minn. Dec. 12, 2013).

[10] BMO Mem. at 2.

[11] *Lam v. Connelly Grp., L.P. (In re Nat'l Metalcraft Corp.)*, 211 B.R. 905, 906 (B.A.P. 8th Cir. 1997) (citing *White v. Nix*, 43 F.3d 374, 376 (8th. Cir. 1994)).

termination of the litigation."[12] In *White v. Nix*, the Eighth Circuit set the standard

for interlocutory appeals:

> It has, of course, long been the policy of the courts to
> discourage piece-meal appeals because most often such
> appeals result in additional burdens on both the court
> and the litigants. Permission to allow interlocutory
> appeals should thus be granted sparingly and with
> discrimination.[13]

Courts should be reluctant to hear interlocutory appeals unless exceptional

circumstances exist such that "postponing appellate review until the entry of a

final order . . . risks tainting the entire course of judicial proceedings."[14] In *In re*

*Moix-McNutt,* on which BMO relies to read expansive discretion into this

process, the petitioner requested appellate review based on gender bias. The

court granted review because to do otherwise would have called into question

the fairness of the entire proceeding. "Tainting the record" is an independent

---

[12] *Blackwell v. Lurie (In re Popkin & Stern)*, 226 B.R. 882, 885 (B.A.P. 8th Cir. 1998)
(citations omitted); *see also In re Nat'l Metalcraft Corp.*, 211 B.R. at 906 ("In order
for an appellate court to permit an interlocutory appeal, the movant must
demonstrate that exceptional circumstances exist, (citation omitted) not merely
that the issue is hard, unique, or the case is difficult.").

[13] 43 F.3d at 376 (quoting *Control Data Corp. v. Int'l Bus. Machs. Corp.*, 421 F.2d 323,
325 (8th Cir. 1970)).

[14] *Moix-McNutt v. Coop (In re Moix-McNutt),* 215 B.R. 405, 408 (B.A.P. 8th Cir.
1997).

standard separate and apart from § 158(a). No such exceptional circumstance exists in this case to justify an interlocutory appeal.

Short of a recusal petition claiming gender discrimination, courts expect "strict adherence" to the three basic tenets in seeking approval for an interlocutory appeal.[15] As discussed below, BMO's appeal fails to satisfy the interlocutory appeal requirements for both standing and *in pari delicto*.[16]

BMO also cites *Dietz v. Spangenberg*[17] for the proposition that a district court can review the order denying summary judgment "because—as here—the bankruptcy court had completed its work and transferred the case."[18] The court

---

[15] *Mitchell v. Smith,* No. 4:04-cv-40160, 2004 U.S. Dist. LEXIS 10839, at *14 (S.D. Iowa June 10, 2004); *see also Shoots v. iQor Holdings US Inc.*, Civ. No. 15-563, 2018 U.S. Dist. LEXIS 88171, at *15 (D. Minn. May 25, 2018) (motion denied); *Hartley*, 2013 U.S. Dist. LEXIS 174943, at *11 (motion denied).

[16] BMO's reliance on *Schwendimann v. Arkwright Advanced Coating, Inc.,* Civ. No. 11-820, 2012 U.S. Dist. LEXIS 157712 (D. Minn. Nov. 2, 2012), is misplaced. The court identified two legal issues where there was a substantial basis for difference of opinion. The first was the validity of a written assignment of intellectual property rights under 35 U.S.C. § 261. The court cited opinions in U.S. patent law going both ways. The court also noted "the dearth of authority" on whether a patent assignment may be reformed," and if so, whether federal or state law applies. *Id.* at *9–12. Judge Montgomery also granted a stay because the case was "in its early stages," and the parties had not yet engaged in significant motion practice. *Id.* at *13. Unlike *Schwendimann*, the Bankruptcy Court relied on settled Minnesota law on the issues of standing and *in pari delicto,* and this matter is not in its "early stages" but is trial ready.

[17] Civ. No. 11-2600, 2013 U.S. Dist. LEXIS 32268 (D. Minn. Mar. 8, 2013).

[18] BMO Mem. at 7.

in *Dietz*, to avoid "imprudent use of judicial resources," treated the denial of

summary judgment as a final order and therefore appealable.[19] Under Minnesota

law, however, a denial of summary judgment is not a final order.[20] There is no

issue of "imprudent use of judicial resources" in this case. Accordingly, the

Court should not depart from the rule that the denial of summary judgment is an

interlocutory order subject to the constraints in 28 U.S.C. § 158(a)(3). BMO itself

spends its entire memorandum treating the denial of summary judgment as a

non-final order subject to the standards for an interlocutory appeal under

§ 158(a)(3).

BMO also claims that courts across the country have granted review "on

**similar** standing and *in pari delicto* questions."[21] The authority BMO cites does

not support that statement. Not one of those cases granted an appeal to review

settled state law, which is the situation in this case. Indeed, one of BMO's cases

was a decision by the Ninth Circuit Court of Appeals that never addressed the

requirements for an interlocutory appeal. In *Williams v. California 1st Bank*, the

court ruled that a trustee had no standing to pursue creditors' claims which had

---

[19] 2013 U.S. Dist. LEXIS 32268, at *20.

[20] *Borchardt v. State Farm Fire & Cas. Co.*, 325 F. Supp. 3d 953, 957 (D. Minn. 2018) ("An order denying a summary-judgment motion is not a final judgment.").

[21] BMO Mem. at 7 (emphasis added).

been assigned to him.[22] There is no such legal issue in this case. Under Minnesota law, the trustee has standing to seek compensation for harm to PCI and to pursue derivative claims of the estate for indirect harm to PCI's creditors.

The court in *In re Advanced RISC Corp.* addressed an appeal that presented "**a question of first impression** in the First Circuit: whether the *in pari delicto* doctrine . . . should bar suit by a trustee on behalf of a debtor that participated in the underlying fraud giving rise to the suit."[23] The second issue was whether "an alleged 'sham' corporation . . . is incapable of suffering injury based on 'deepening insolvency.'"[24] Neither of these issues is before this Court, as BMO admits in its "Questions Presented":

1.  Does the trustee have standing to seek recovery of creditor losses labeled as amounts PCI cannot repay?

2.  Is the Trustee subject to BMO's *in pari delicto* defense as a matter of law given the undisputed facts concerning PCI's fraud?[25]

---

[22] 859 F.2d 664, 667 (9th Cir. 1988).

[23] *Nickless v. Merrill Lynch, Pierce, Fenner & Smith, Inc. (In re Advanced RISC Corp.)*, 317 B.R. 455, 457 (D. Mass. 2004) (emphasis added).

[24] *Id.* at 456.

[25] BMO Mem. at 6.

Nor does *Adelphia Recovery Trust v. Bank of America, N.A.* include any question "similar" to the issues in this case.[26] The *Adelphia* court determined that there was law in New York that conflicted with the bankruptcy court's ruling on standing. The court did not address the *in pari delicto* defense. Here, there is no conflict in Minnesota law between the Bankruptcy Court's rulings and settled Minnesota law on both standing and *in pari delicto*. None of the cases BMO cites is from Minnesota. In its briefing, BMO chooses to ignore that standing and the impact of an appointment of a receiver prior to bankruptcy are settled law in Minnesota. Calling these cases "similar" is like calling a lion and a giraffe similar because they are both wild animals, despite their obvious differences.

Finally, BMO claims that PCI's wrongdoing is worse than M&I's. But it ignores the Department of Justice finding of M&I's fraud in participating in the Ponzi scheme. At a minimum, as the Bankruptcy Court ruled, a comparison of wrongdoing is a question of fact.

## II. The Bankruptcy Court correctly determined that Plaintiff has standing to assert PCI's claims for harm to PCI against BMO.

BMO cannot meet the stringent interlocutory appeal standard on the issue of standing because it cannot demonstrate substantial grounds for a difference of

---

[26] No. 03-MDL-1529, 2007 U.S. Dist. LEXIS 66084 (S.D.N.Y 2007).

opinion on the applicable law governing Plaintiff's standing. Nor can BMO meet the other two § 158(a) standards for an interlocutory appeal of the standing issue.

Under bankruptcy law, a trustee has standing to pursue claims belonging to the debtor estate on the date of the bankruptcy filing, and the property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."[27] Courts look to state law to determine "whether a particular cause of action arising under state law belonged to the debtor in bankruptcy or to someone else."[28] In the summary judgment order, Judge Sanberg found that Minnesota law "provides that a corporation may bring a claim when it has been injured for either direct or derivative harm" and "controls the analysis of whether a claim is direct or derivative."[29] More specifically, the Supreme Court of Minnesota has determined that a proper method of distinguishing between a direct and derivative claim is to consider "whether the injury to the individual plaintiff is separate and distinct from the injury to other

---

[27] 11 U.S.C. § 541(a)(1); *see also id.* §§ 704(1), 1106(a).

[28] *Moratzka v. Morris (In re Senior Cottages of Am., LLC)*, 482 F.3d 997, 1001 (8th Cir. 2007) (citing *Mixon v. Anderson (In re Ozark Rest. Equip. Co.)*, 816 F.2d 1222, 1225 (8th Cir. 1987)).

[29] SJ Order at 7, 7 n.38 (citing Minnesota case law), 7 n.41 (citing 8th Circuit and Minnesota case law).

persons in a similar situation as the plaintiff."[30] That is, "when shareholders are injured only indirectly, the action is derivative; when shareholders show an injury that is not shared with the corporation the action is direct."[31] This standard is not in dispute.

The Bankruptcy Court was correct in its interpretation of that law and its finding that Plaintiff has standing to pursue direct and derivative claims of the estate against BMO. Thus, there are no "substantial ground[s] for a difference of opinion"[32] as to the applicable law in the Eighth Circuit or Minnesota, and this is not the exceptional case that merits interlocutory review.

Knowing this, BMO instead attacks Judge Sanberg's order based on the false premise it has employed for years that Plaintiff seeks to recover for harm to PCI's creditors as opposed to PCI itself. With this mischaracterization, BMO attempts to inject doubt about the law on standing and the Bankruptcy Court's adherence to it. But Plaintiff has only ever asserted claims based on harm to PCI. As Judge Sanberg recognized, **Plaintiff has consistently sought to recover damages representing "the amount that Petters and his associates fraudulently paid**

---

[30] *In re Medtronic, Inc. S'holder Litig.*, 900 N.W.2d 401, 407-08 (Minn. 2017) (quoting *Nw. Racquet Swim & Health Clubs, Inc. v. Deloitte & Touche*, 535 N.W.2d 612, 617 (Minn. 1995)).

[31] *Id.* at 409.

[32] *In re SRC Holding Corp.*, 2006 U.S. Dist. LEXIS 95217, at *3.

**from the PCI Account at M&I that became unavailable for repayment of creditors."**[33]

The Court should deny BMO's motion for interlocutory review of the Bankruptcy Court's decision on standing.

### A. Judge Sanberg properly recognized Plaintiff's claims as seeking damages for direct harm to PCI.

By repeatedly calling Plaintiff's claims ones for creditor losses, BMO tries to create a conflict of law where none exists. Plaintiff has, from the start, asserted claims based on the harm that M&I Bank caused to PCI.[34] BMO cannot change the true nature of Plaintiff's asserted harm simply by improperly characterizing it as the creditors', no matter how many times it repeats that fiction. Judge Sanberg therefore rightly found BMO's position unpersuasive, and this Court should do the same.[35]

---

[33] SJ Order at 9, 9 n.50 (emphasis added).

[34] Because Plaintiff does not assert claims belonging to PCI's creditors, BMO's cases establishing that trustees cannot bring creditors' personal claims—*Caplin v. Marine Midland Grace Trust Co. of N.Y.*, 406 U.S. 416 (1972); *In re Senior Cottages*, 482 F.3d 997; and *In re Ozark Rest. Equip. Co.*, 816 F.2d 1222 (8th Cir. 1987)—are unhelpful here on that argument.

[35] Though not presenting it as a basis for appeal, BMO attempts to preserve its "sham corporation" argument via footnote. *See* BMO Mem. at 7 n.2. The Bankruptcy Court rejected BMO's argument and noted "No Minnesota or Eighth Circuit cases have adopted the 'sham corporation' theory and the theory itself has been called into question by decisions within the Eleventh Circuit." SJ Order at 11.

Judge Sanberg also saw through BMO's attempt to treat Plaintiff's injury as mere "recharacterize[d] creditor losses," concluding that "**under Minnesota law**, **Defendant has failed to show as a matter of law that Plaintiff lacks standing to pursue direct claims for harm to PCI because of its inability to repay creditors caused by the fraudulent and improper withdrawals from the PCI Account.**"[36] BMO cites several non-Minnesota cases to challenge the Bankruptcy Court's finding, but noticeably absent among them is the on-point and precedential Eighth Circuit case, *In re Senior Cottages*, which roundly rejects BMO's claim that Plaintiff lacks standing because any recovery it makes will go to creditors. In *Senior Cottages*, the Eighth Circuit stated: "We think it is irrelevant that, in bankruptcy, a successfully prosecuted cause of action leads to an in-flow of money to the estate that will immediately flow out again to repay creditors . . . ."[37] The *Senior Cottages* court quoted from *Lafferty*, in which the Third Circuit reasoned:

> "The . . . assertion that this action will benefit creditors is not an admission that this action is being brought on their behalf. . . .

---

[36] SJ Order at 11 (emphasis added).

[37] 482 F.3d at 1006 (quoting *Official Comm. Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 348 (3d Cir. 2001)); *see also Gordon v. Basroon* (*In re Plaza Mortg. & Fin. Corp.*), 187 B.R. 37, 42 (Bankr. N.D. Ga. 1995) ("To find that the trustee has no standing to pursue causes of action belonging to the debtor because the recovery would only benefit the creditors is an absurd argument, given the fact that the trustee's goal is to make a distribution to creditors.").

> **Simply because the creditors of a[n] estate may be the primary or even the only beneficiaries of such a recovery does not transform the action into a suit by the creditors."**[38]

This binding Eighth Circuit precedent undermines BMO's entire "creditor losses" argument and obviates the need for the Court to consider BMO's other cases. Doing so, however, only further supports Judge Sanberg's conclusion.

BMO would first have the Court look to the *Senior Cottages* bankruptcy court decision, which found that a trustee lacked standing to assert claims against a law firm that assisted in the underlying fraud.[39] BMO urges the Court to follow the decision's reasoning that the trustee lacked standing because he alleged claims based on "an injury to the individual interests of creditors of Senior Cottages."[40] BMO made this same argument on summary judgment, but Judge Sanberg rejected it and reprimanded BMO for failing to disclose the Eighth

---

[38] 267 F.3d at 348-49 (emphasis added) (quoting *Waslow v. Grant Thornton LLP (In re Jack Greenberg, Inc.)*, 240 B.R. 486, 506 (Bankr. E.D. Pa. 1999)); *see also Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1004 (9th Cir. 2005) ("It is, of course, true that the dissipation of assets limited the firm's ability to repay its debts in liquidation. Acknowledgement of this fact is not, however, a concession that only the creditors, and not [the debtor] itself, have sustained any injury. Instead, it is a recognition of the economic reality that any injury to an insolvent firm is necessarily felt by its creditors.").

[39] *Moratzka v. Morris (In re Senior Cottages of Am., LLC)*, 320 B.R. 895, 901 n.11 (Bankr. D. Minn. 2005).

[40] *Id*. at 896-98; BMO Mem. at 10.

Circuit opinion's effect on the bankruptcy court order.[41] Unchastened, BMO again offers the *Senior Cottages* bankruptcy decision in support of its standing argument, suggesting that "the Eighth Circuit did not reject the holding on which BMO relied—namely, that the trustee lacked standing to assert claims based on harm to creditors."[42] BMO argues that the Eighth Circuit disagreed with an "entirely different" standing ruling by the district court and "said nothing to cast doubt on the bankruptcy court's *original* ruling that the trustee lacked standing."[43] Once again, BMO gets *Senior Cottages* wrong.

In rejecting the proposed amended complaint at issue on appeal, the *Senior Cottages* district court actually employed the same reasoning the bankruptcy court used in dismissing the original complaint: the trustee lacked standing where any recovery would go immediately to creditors.[44] Indeed, the district court echoed the bankruptcy court's initial dismissal order that held a trustee cannot assert claims where the allegation "clearly envisions the [bankruptcy

---

[41] SJ Order at 10, 10 n.59.

[42] BMO Mem. at 12.

[43] *Id.* (emphasis in original).

[44] *In re Senior Cottages*, 482 F.3d at 997 (quoting the district court's order, *Moratzka v. Senior Cottages of America, LLC*, No. Civ. 05-809, 2005 U.S. Dist. LEXIS 17595 (D. Minn. Aug. 18, 2005) ("Ultimately, Trustee is unable to show that Debtor would act as anything other than a conduit of recovery for creditors under the Proposed Amended Complaint.")).

estate] as no more than a vehicle for a recovery to benefit creditors."[45] Because of the identity of reasoning between the bankruptcy court's decision and the district court's decision, the Eighth Circuit's rejection of the latter absolutely did "cast doubt on the bankruptcy court's *original* ruling," contrary to BMO's argument.[46] The Eighth Circuit specifically held that a trustee has standing to recover harm caused by the defendant to the debtor company, regardless of whether any recovery "will immediately flow out again to repay creditors."[47] That decision gutted a central element of the bankruptcy court's standing analysis, rendering it inapposite here.

BMO's out-of-jurisdiction cases fare no better under closer scrutiny. The summary judgment order addressed *Perkins v. Smith, Gambrel & Russel LLP*,[48] a 2010 case from the Northern District of Georgia that BMO again cites here, and it rightly determined that *Perkins* in fact supports Plaintiff's position. In *Perkins*, the

---

[45] *In re Senior Cottages*, 320 B.R. at 900-01.

[46] *See In re Senior Cottages*, 482 F.3d at 1005-06.

[47] *Id.* (quoting *Lafferty*, 267 F.3d at 348-49); *see also Baena v. KPMG LLP*, 453 F.3d 1, 5 (1st Cir. 2006) ("That the creditors will benefit if such a suit is successful does not mean that their own claims against [the defendant] are at issue. They will benefit because they have claims against [the debtor], it is bankrupt, and under the plan they have access to the company's residual assets; among the assets are such claims as [the debtor] may have against [the defendant].").

[48] No. 08-cv-2673, 2010 U.S. Dist. LEXIS 153569 (N.D. Ga. July 27, 2010).

court relied on Georgia law for the proposition that a plaintiff cannot claim "lost investments" to establish standing and ruled that a corporation had standing to bring a legal malpractice claim against a law firm, because, unlike the investors, it had retained the law firm. The court quoted the established Georgia rule that: "A trustee should be careful not to plead damages as an amount equal to the funds invested in the debtor's Ponzi scheme, but should measure damages based on funds improperly paid out by the debtor."[49] As Judge Sanberg correctly found, this is precisely the measure of damages in the instant case: "funds improperly paid out by Petters from the PCI Account for the applicable period— $1,925,748,160."[50] BMO argues that the phrase "funds improperly paid out by the debtor" typically refers to embezzlement or looting, but it offers no authority for this position and also fails to distinguish Petters' actions from the "typical" actions it references.[51]

BMO's remaining cases all fail to present the requisite "substantial grounds for difference of opinion" because they address facts and claims fundamentally different from this case. *Hirsch v. Arthur Andersen & Co.*; *In re Agape World, Inc.*; *In*

---

[49] *Id.* at *35.

[50] SJ Order at 9, 9 n.55 ("As Plaintiff's damages expert has testified, '[t]he damages that have been identified here are damages that reflect the harm to PCI in so far as PCI's inability to pay its creditors.'").

[51] *See* BMO Mem. at 13.

*re Meridian Asset Management, Inc.*; *American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Securities Corp.*; and *In re Gaudette* all rely heavily on the Second Circuit's *Wagoner* Rule and its improper blending of standing and *in pari delicto* inquiries.[52] As Judge Sanberg noted, the Eighth Circuit has rejected that Rule, making these cases inapplicable here.[53] *In re Latitude Solutions, Inc.* and *Melamed v. Lake County National Bank* both considered the proof and measure of damages on post-trial motions and concluded that a trustee could not rely on creditor **claims** as a proper measure of damages—facts demonstrably not present here.[54] And *In re Plaza Mortgage & Finance Corp.* actually supports Plaintiff's standing, holding that

---

[52] *Hirsch*, 178 B.R. 40, 43 (D. Conn. 1994) ("[T]he critical question in the instant case is whether the trustee has alleged that the defendants have caused damage to the debtors—or, put another way, whether the debtors themselves could have prevailed against the defendants on any legal theory presented in the complaint. *See Wagoner*, 944 F.2d at 119."); *Silverman v. Meister Seelig & Fein, LLP (In re Agape World, Inc.)*, 467 B.R. 556, 572 (Bankr. E.D.N.Y. 2012) (citing *Wagoner* for proposition that "a bankruptcy trustee lacks standing to seek recovery on behalf of a debtor company against third parties for injuries incurred by the misconduct of the debtor's controlling managers"); *Sec. Investor Prot. Corp. v. Capital City Bank (In re Meridian Asset Mgmt., Inc.)*, 296 B.R. 243, 257 (Bankr. N.D. Fla. 2003) ("[T]he *Wagoner* rule states that when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against that third party for the damage to the creditors because the claim belongs to the creditors."); *Am. Tissue*, 351 F. Supp. 2d 79, 90-91 (S.D.N.Y. 2004) (citing *Hirsch* for its standing analysis); *Erricola v. Gaudette (In re Gaudette)*, 241 B.R. 491, 502 (Bankr. D.N.H. 1999) (also relying on *Hirsch* for the standing analysis BMO cites).

[53] SJ Order at 9, 9 n.52 (citing *Senior Cottages*, 482 F.3d at 1002-04).

[54] *Ebert v. Dejoria (In re Latitude Sols., Inc.)*, 922 F.3d 690, 695-97 (5th Cir. 2019); *Melamed*, 727 F.2d 1399, 1403-04 (6th Cir. 1984).

it would be "absurd" to deny a trustee standing to pursue the debtor's claims because the recovery would only benefit the creditors.[55] Further, the *In re Plaza* court's instruction that in a Ponzi scheme case the trustee should measure damages not "as amount equal to the funds invested in the debtor's Ponzi scheme" but rather "based on funds improperly paid out by the debtor" only buttresses Plaintiff's position.[56] Plaintiff has consistently alleged damages not based on funds invested in the scheme (some $40 billion) but rather on the amount improperly paid out by Petters that created the $1.9 billion shortfall[57] Plaintiff now seeks to recover.[58]

---

[55] *In re Plaza Mortg.*, 187 B.R. at 41-42 ("To find that the trustee has no standing to pursue causes of action belonging to the debtor because the recovery would only benefit the creditors in an absurd argument, given the fact that the trustee's goal is to make a distribution to creditors.").

[56] *Id.* at 44-45.

[57] Plaintiff's expert, Theodore F. Martens, confirmed harm to PCI in the amount of $1,925,748,160—the funds Petters stole from PCI's account at M&I that PCI cannot repay to its creditors. Martens Expert Report at 47 (Mar. 14, 2018), attached as Ex. 1 to the Declaration of Michael D. Reif ("Reif Decl.").

[58] The *In re Plaza Mortgage* court also addressed the purported policy concern BMO raises that allowing Plaintiff's claims would result in the "complexities of overlapping suits by estate representatives and creditors against the same defendants over the same losses," (BMO Mem. at 11), calling such rationale "hard to follow." 187 B.R. at 41. The court clarified: "If the trustee and the creditors have different claims, and if the trustee recovers and makes a distribution to creditors, this does not deprive the creditors of standing to bring their claims. It only reduces their damage claim to the extent they have received a distribution from the estate." *Id.*

At their core, BMO's argument and the cases cited in support of it

fundamentally misstate Plaintiff's damages by casting them in terms of harm to

creditors alone. Judge Sanberg considered and explicitly rejected this

characterization by BMO at both the summary judgment and the motion to

dismiss stage. In the Bankruptcy Court's order denying BMO's motion to

dismiss, Judge Sanberg relied on the Minnesota Supreme Court's decision in

*Northwest Racquet Swim & Health Clubs, Inc. v. Deloitte & Touche*[59] in finding that

Plaintiff had standing to pursue its claims where "the type of harm described . . .

injured PCI, and indirectly harmed all of PCI's creditors" while refusing to

extend standing to "direct claims belonging solely to the . . . creditors."[60] BMO's

failure to accept this settled law of the case does not make the summary

judgment order ripe for appeal any more that it changes the simple fact that

Plaintiff's claims all address the harm M&I only inflicted directly upon PCI.

Further, nothing in the Bankruptcy Court's references to the shared, indirect

---

[59] 535 N.W.2d at 617.

[60] Order of Feb. 24, 2017, at 8-11 (Case No. 19-1756, ECF No. 4-14). Because all of Plaintiff's claims, as the Bankruptcy Court repeatedly held, are based on harm to the debtor, BMO's fearmongering over the ramifications of trustees making claims for creditor losses is easily dismissed. *See* BMO Mem. at 11. Plaintiff seeks damage that M&I caused to PCI; defenses "based on a creditor's circumstances" are inapplicable here, as Judge Sanberg recognized.

harm suffered by PCI's creditors alters the fundamental nature of the harm to PCI or the standing Plaintiff has to assert claims to remedy it.[61]

### B.   Judge Sanberg correctly concluded that Plaintiff has standing to pursue the derivative claims of the estate.

Judge Sanberg rightly decided that derivative, or indirect, claims for the benefit of creditors are indisputably the property of the estate—not because they are "derivative of a shareholder's or creditor's rights and losses," as BMO wrongly claims, but because they assert harm to PCI that also represents shared harm to creditors.[62] This, of course, contradicts BMO's assertion that the Bankruptcy Court adopted "something entirely different and novel: a *reverse* "derivative claim." Instead, Judge Sanberg's decision that Plaintiff has standing to "pursue the estate's derivative claims for harm to all creditors similarly situated" is consistent with Minnesota law, including the Minnesota Supreme Court's decision in *In re Medtronic, Inc. Shareholder Litigation* and the Minnesota Court of Appeals' decision in *Greenpond South, LLC v. General Electric Capital Corp.*[63] Accordingly, the Bankruptcy Court's decision on Plaintiff's standing to

---

[61] *See Wessin v. Archives Corp.*, 592 N.W.2d 460, 464 (Minn. 1999) ("Where the injury is to the corporation, and only indirectly harms the shareholder," the claim belongs to the corporation, not the individual).

[62] *See Medtronic*, 900 N.W.2d at 409; Order of Feb. 24, 2017, at 6-11 (Case No. 19-1756, ECF No. 4-14).

[63] SJ Order at 12.

assert derivative claims of the estate does not implicate exceptional circumstances or substantial grounds for a difference of opinion, and interlocutory appeal is inappropriate.

The question of whether a claim against a third party for harm inflicted on a bankrupt corporation belongs to the estate or to an individual creditor is governed by state law.[64] Under Minnesota's standing test, the inquiry focuses on whether the plaintiff's injury was directly caused by the defendant. Indeed, a plaintiff creditor or shareholder in Minnesota cannot bring a claim for injury caused indirectly to the creditor or shareholder as a result of harm initially inflicted on the corporation.[65] The Minnesota Supreme Court confirmed this very standard in *Medtronic*, holding "when shareholders are injured only indirectly, the action is derivative; when shareholders show an injury that is not shared with the corporation, the action is direct."[66]

Thus, under Minnesota law, the "direct-versus-derivative" question is answered by "identifying who suffered the injury and therefore who is entitled

---

[64] *Greenpond S., LLC v. Gen. Electric Capital Corp.*, 886 N.W.2d 649, 655 (Minn. Ct. App. 2016). Because of this, BMO's various cites to Bankruptcy Code §§ 541 and 544 and any "black-letter bankruptcy law" is merely a distraction. *See* BMO Mem. at 14. Minnesota law on direct and derivative claims is settled, and the Bankruptcy Court has applied it consistently for more than 2 years in this case.

[65] *See Wessin*, 592 N.W.2d at 464.

[66] 900 N.W.2d at 409.

to the recovery for that injury."[67] Judge Sanberg properly applied that standard

when she analyzed standing on BMO's motion to dismiss, ultimately

determining that Plaintiff had standing to pursue all claims in which it alleged

harm that "injured PCI, and indirectly harmed all of PCI's creditors."[68] She did

so again on summary judgment, confirming that Plaintiff's claims include "the

estate's derivative claims for harm to all creditors similarly situated."[69]

BMO fundamentally misrepresents the Bankruptcy Court's discussion of

derivative claims in an effort to create an issue for appeal, stating that Judge

Sanberg "also opined that Minnesota law gives debtor corporations—and thus

their estate representatives—the right to bring 'derivative claims' based on

injuries to the corporation's creditors."[70] **But that opinion does not exist in the**

**summary judgment order**. Instead, the Bankruptcy Court held: "Plaintiff's

---

[67] *Id.*

[68] Order of Feb. 24, 2017, at 8-11 (Case No. 19-1756, ECF No. 4-14). The Bankruptcy Court's refusal at the Motion to Dismiss stage to find standing for a breach of fiduciary duty claim owed to creditors in Count II and in a civil conspiracy claim in Count V further reinforces its proper application of Minnesota's direct versus derivative test. On those claims, the Bankruptcy Court determined that Plaintiff did not seek to recover harm done directly to PCI, and it dismissed them accordingly, demonstrating its proper application of the very "who was injured" test that BMO repeats throughout its briefing.

[69] SJ Order at 12.

[70] BMO Mem. at 15.

alleged harm is **the inability to repay creditors** due to funds being improperly paid out of the PCI Account by Petters and his associates. **This indirectly harms all of PCI's creditors by virtue of their status as creditors. . . . Plaintiff may pursue the estate's derivative claims for harm to all creditors similarly situated.**"[71] By acknowledging that the derivative claims at issue belong to the estate and are based on direct harm to the debtor and shared indirect harm to PCI's creditors, the Bankruptcy Court's holding accurately applies established Minnesota law on standing and defeats BMO's entire argument.

Judge Sanberg's opinion is entirely consistent with the Minnesota Supreme Court's ruling in *Medtronic*.[72] It further aligns with *Wessin v. Archives Corp.*, in which the Minnesota Supreme Court held: "Where the injury is to the corporation, and only indirectly harms the shareholder, the claim must be pursued as a derivative claim."[73] And it accords perfectly with *Greenpond*, a Minnesota Court of Appeals case that addressed a dispute between creditors in the Petters Ponzi scheme litigation and found:

> [T]he harm sustained by the Petters entities as a result of fraudulent withdrawals from their accounts of other lenders' funds was its

---

[71] SJ Order at 12 (emphasis added).

[72] 900 N.W.2d at 409 ("Put more simply, when shareholders are injured only indirectly, the action is derivative; when shareholders show an injury that is not shared with the corporation, the action is direct.").

[73] 592 N.W.2d at 464.

insolvency and **inability to repay its debtors** . . . . And, under the
*Wessin* test, which distinguishes direct from derivative claims by
determining whether the injury harmed the stakeholder directly or the
corporation, the injury here was suffered by the Petters entities as a
direct result of Thomas Petters' actions, and only indirectly harmed
Acorn and the other creditors of the Petters entities.[74]

BMO argues that this *Greenpond* holding is dicta, but it is actually central to the

issue on appeal: whether the creditor had standing to assert its claims against the

defendant.[75]

Free from BMO's mischaracterization of the Bankruptcy Court's ruling on

derivative claims, the record is plain—there are no exceptional circumstances or

substantial grounds for a difference of opinion on applicable law that justify an

interlocutory appeal. Minnesota law on standing is well established, and Judge

---

[74] 886 N.W.2d at 657 (emphasis added).

[75] *Id.* at 654, 658. BMO also implies in a footnote that *Greenpond* is no longer good
law after *Medtronic*, an argument it made and Judge Sanberg squarely rejected on
summary judgment. BMO Mem. at 17 n.7. After the Minnesota Supreme Court
decided *Medtronic*, Chief Justice Gildea, the author of *Medtronic*, issued an order
vacating the stay in *Greenpond* and denying Greenpond's petition for review to
the Court. No. A16-0350, 2017 Minn. LEXIS 655 (Minn. Sept. 27, 2017).
Greenpond then filed a motion to modify the denial of review, arguing that the
Court of Appeals' decision was no longer good law and specifically requesting
that the case be remanded to the Court of Appeals for reconsideration in light of
*Medtronic*. Rejecting these arguments, Chief Justice Gildea denied that
application as well. No. A16-0350, *mot. to modify denied,* (Minn. Oct. 19, 2017),
attached as Reif Decl. Ex. 2. *Greenpond* is therefore now established Minnesota
precedent. *See, e.g., Forster v. Theis*, 906 N.W.2d 846, 852 (Minn. Ct. App. 2017)
(citing *Greenpond* with approval).

Sanberg accurately applied it in denying BMO's motion for summary judgment.

Accordingly, there is no basis for interlocutory appeal.

BMO has also failed to show that rejecting the appeal of the standing issue "would result in wasted litigation and expense," and that the appeal would materially advance after the litigation." Judge Sanberg ordered the transfer of the case because after nearly three years of discovery and motion practice, **the case is trial ready**. Both parties have expended tens of millions of dollars over the course of this case, and all that remains is a trial—the time and cost of which pales in comparison to what the parties have already expended. BMO also cannot show "material" advancement, for if the bank were to obtain a jury verdict, the issue of standing would be moot, thus avoiding the time, expense, and delay that granting the appeal would cause.[76] Nor would BMO's standing argument be tainted or prejudiced by an appeal after trial.

### III.   The Bankruptcy Court correctly applied Minnesota law to bar *in pari delicto*.

The fatal flaw in BMO's *in pari delicto* argument is that it fails to discuss settled Minnesota law that a receiver removes wrongdoers prior to bankruptcy—

---

[76] *See In re Popkin & Stern,* 226 B.R. at 885 ("[I]mmediate appeal would merely produce delay, additional costs to all parties, and appellate consideration of the issue that may be moot upon conclusion of the litigation . . . .").

the basis for the Bankruptcy Court's decision barring the *in pari delicto* defense as a matter of law.[77] BMO restricts its argument to the Bankruptcy Code, including 11 U.S.C. § 541, and contends there is a conflict between the Code and Minnesota law. **But that section specifically provides that property interests, including causes of action and defenses such as *in pari delicto*, are to be determined by state law.[78]**

BMO's failure to discuss established Minnesota law on receivers is an admission that it cannot meet the requirement of "a substantial basis for difference of opinion." Accordingly, its appeal should be dismissed.

The Bankruptcy Court explained the Minnesota law of receivership clearly and succinctly:

> **The defense of *in pari delicto* is not embodied in the Bankruptcy Code—it is an equitable defense governed by state law.[79]** Under Minnesota law, first, courts are afforded discretion over whether to apply equitable defenses.[80] Second, Minnesota state and federal courts have consistently declined to apply *in pari delicto* when an equity receiver has

---

[77] SJ Order at 16.

[78] *See In re Mehlhaff*, 491 B.R. at 900, 902 (discussing § 541(a), "[t]he nature and extent of the debtor's interest in property are determined by **state law**. . . . Section 541 (a) includes **causes of action** existing at the time of the commencement of the bankruptcy case" (emphasis added)); *see also In re Petters Co.,* 561 B.R. 738, 757 (Bankr. D. Minn. 2016) (same).

[79] *Grassmueck v. Am. Shorthorn Ass'n,* 402 F.3d 833, 837 (8th. Cir. 2005).

[80] *City of N. Oaks v. Sarpal*, 797 N.W.2d 18, 23 (Minn. 2011).

been appointed because the wrongdoer is removed from the picture; the underlying purpose of the of the *in pari delicto* defense, to avoid court entanglement in a dispute between wrongdoers, is gone.[81] **Instead of being wrongdoers, receivership entities are considered victims of the fraud and creditors in a Ponzi scheme case.**[82]

At the time the bankruptcy was filed, Kelley's appointment as equity receiver had removed the wrongdoers and corrupt management. PCI had become a receivership entity.[83] The Receivership Order granted Kelley the full power of an equity receiver, including the power to sue for all assets of PCI.[84] Kelley filed the bankruptcy case pursuant to his authority as receiver, even though here he is now acting as successor in interest to the Chapter 11 Trustee.[85] [86]

Judge Sanberg also noted that BMO "did not cite any **controlling**

**Minnesota or Eighth Circuit case law** providing that *in pari delicto* becomes

available once a receivership entity is placed in bankruptcy . . . . **Defendant**

**provides no support for its contention that *in pari delicto* could have been**

---

[81] *Zayed v. Associated Bank, N.A.*, No. 13–232 (DSD/JSM), 2015 WL 4635789, at *3 (D. Minn. Aug. 4, 2015) (citing *Kelley v. Coll. of St. Benedict*, 901 F. Supp. 2d 1123, 1129 (D. Minn. 2012)).

[82] *Zayed v. Peregrine Fin. Grp., Inc.*, No. 12–269 (MJD/FLN), 2012 WL 2373423, at *2 (D. Minn. June 22, 2012). "Put differently, the defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated." *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995).

[83] Pl.'s Resp., Dkt. 342, Ex. 5 [Adv. No. 12-4288, ECF No. 342].

[84] *Id*.

[85] The receivership, with Kelley as receiver, is still ongoing. *See United States v. Petters*, No. 08-cv-05348 (D. Minn.).

[86] SJ Order at 15-16.

**raised against the PCI Receivership.**"[87] In its motion for leave to appeal, BMO

once again fails to cite any controlling Minnesota or Eighth Circuit law in

support of its argument.

BMO attempts to support its position that receivers do not remove

wrongdoers by citing three cases: *In re Derivium Capital LLC*[88]; *Peterson v.*

*McGladrey & Pullen, LLP*[89]; and *Grassmueck v. American Shorthorn Association*[90].[91] **It**

**then refutes its own argument by admitting that none of these cases involved a**

**pre-petition receiver.**[92]

BMO wrongly claims that *Grassmueck* holds that the Bankruptcy Code

governs the application of *in pari delicto* to an estate. To the contrary, in

*Grassmueck*, the Eighth Circuit reaffirmed that *in pari delicto* is governed by state

law.[93]

BMO's Bankruptcy Code-based arguments are not only incorrect, but they

are irrelevant because they ignore Minnesota law barring *in pari delicto* once a

---

[87] *Id.* at 16 (emphasis added).

[88] 716 F.3d 355 (4th. Cir. 2013).

[89] 676 F.3d 594 (7th Cir. 2012).

[90] 402 F.3d at 833.

[91] BMO Mem. at 20.

[92] *Id.*

[93] *Grassmueck*, 402 F.3d at 837.

receiver has been appointed. Nothing in § 541(c)(1)(B) or § 543(b)(1) changes the outcome in this case. Those Bankruptcy Code provisions, as confirmed by the Ninth Circuit bankruptcy appellate panel in *In re Metropolitan Adjustment Bureau*[94] (a case evaluating the powers of a conservator under California law), merely address the physical transfer of property from a pre- bankruptcy custodian to the trustee. They say nothing about the effect of the receiver's appointment on the *in pari delicto* defense. Nor do *In re Skinner*[95] and *In re Cash Currency Exchange, Inc.*[96]

For similar reasons, BMO's convoluted argument about repealed § 587 and the receiver's authority to bring the claims in this suit has no bearing on this case. BMO raises the specter of § 587 in an apparent effort to suggest that a trustee cannot be given the powers of an equity receiver. But the repeal of § 587 and the explanation provided in *United States v. Gigli*[97] does not nullify the cleansing effect of the receiver appointment on PCI in this case. In *Gigli*, the District Court for the Western District of Pennsylvania ruled that a criminal indictment under the Bankruptcy Code did not constitute an offense because the

---

[94] 22 B.R. 67 (B.A.P. 9th Cir. 1982).

[95] *Skinner v. First Union Nat'l Bank (In re Skinner)*, 213 B.R. 335 (Bankr. W.D. Tenn. 1997).

[96] 762 F.2d 542 (7th Cir. 1985).

[97] 37 B.R. 939 (W.D. Pa. 1984).

amended Code was not in effect when the bankruptcy at issue in the case commenced.[98] That holding has no bearing here.

BMO's reliance on *Perkins v. Smith, Gambrell & Russell, LLP*[99] is also misplaced. The *Perkins* court cited an Eleventh Circuit case, *Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards*[100], in support of the dubious proposition that *in pari delicto* can be asserted against an "innocent party."[101] But no receiver was ever appointed in *Edwards*, and thus the Eleventh Circuit never considered that issue. Moreover, the question in *Edwards* was whether *in pari delicto* bars a RICO claim by a conspirator.[102] The court ruled that the defense applied as a matter of federal, not state law.[103] Neither *Perkins* nor *Edwards* referenced Minnesota law, which governs *in pari delicto* in this case.

Similarly, BMO struggles and ultimately fails to distinguish *Mukamal v. BDO Seidman LLP (In re E.S. Bankest L.S.)*[104] and *Kirschner v. Wachovia Capital*

---

[98] *Id.* at 943–44.

[99] 2010 U.S. Dist. LEXIS 153569.

[100] 437 F.3d 1145 (11th Cir. 2006).

[101] *Perkins*, 2010 U.S. Dist. LEXIS 153569, at *41-42.

[102] *Edwards*, 437 F.3d at 1152.

[103] *Id.* ("The federal law of affirmative defenses governs the enforcement of causes of action created by Federal statutes.").

[104] Adv. No. 06-1220, 2010 Bankr. LEXIS 2425 (Bankr. S.D. Fla. July 23, 2010).

*Markets, LLC (In re Le-Nature's Inc.).*[105] Indeed, the court in *In re E.S. Bankest* called BMO's theory that *in pari delicto* suddenly reappears upon the filing of bankruptcy nonsense:

> Since it was this Court-appointed Receiver that put Bankest into bankruptcy – and no prior wrongdoing could be imputed to him in that capacity and thus no *in pari delicto* defense could apply – **it would make no sense to say that suddenly imputation and *in pari delicto* were 'back' when that Receiver caused Bankest to file for bankruptcy.**[106]

Further, contrary to BMO's claim, the Bankruptcy Court was under no obligation to "meaningfully address" other cases from New York and elsewhere when Minnesota receivership law is undisputed.

BMO makes a policy argument based on its own contrived term, "inherited immunity"—a term found nowhere in any Minnesota case or any other case. That term ignores the very reason that a receiver is appointed, which is to take control of estate assets and oust wrongdoers. BMO's policy argument that receivers should not have the power to remove wrongdoers prior to filing bankruptcy, thus eliminating the basis for *in pari delicto*, is not only ill-advised but would allow wrongdoers to continue to loot their companies and further dissipate assets—exactly the opposite of the Bankruptcy Code's intended

---

[105] Civ. No. 08-1518, 2009 U.S. Dist. LEXIS 85149 (W.D. Pa. Sept. 16, 2009).

[106] 2010 Bankr. LEXIS 2425, at *7 (emphasis added).

purpose of maximizing estate assets.

Finally, BMO fails to meet the other requirements for an interlocutory

appeal on the *in pari delicto* ruling for the same reasons it fails on standing.

## IV.   The Bankruptcy Court had sufficient basis for ruling that a dispute of material fact precludes summary judgment.

The Bankruptcy Court recognized the deep and active involvement of

M&I in the Petters Ponzi scheme. The Court pointed to two facts, in particular,

that distinguished this case from those cited by BMO and tipped the balance of

harm to M&I:

> Plaintiff cites the conclusion of a Department of Justice investigation that **M&I committed fraud** in connection with the Ponzi scheme in its handling of the PCI account and entering into the DACAs [Deposit Account Control Agreements]. Moreover Deanna Coleman[107] testified that M&I perpetuated the Ponzi scheme. A jury must hear and weigh evidence in order to apportion fault. Thus, the dispute as to material facts precludes summary judgment.[108]

There are voluminous facts that provide support for Judge Sanberg's ruling.

After nearly three years of discovery, Plaintiff has developed an extensive record

of M&I's fraud on PCI, from its failure to advise investors — when it had a duty to

---

[107] Ms. Coleman is a convicted felon who assisted Petters for years before eventually disclosing the fraud to the FBI.

[108] SJ Order at 17 (emphasis added).

do so—that big box retailers were not making payments into the PCI account, to

ignoring scores of fraud alerts from its own internal detection system. As Judge

Sanberg noted, the Department of Justice, after its own investigation, concluded

that M&I committed fraud in connection with the Petters Ponzi scheme. In an

October 12, 2018 settlement agreement with BMO Harris Bank, N.A. as successor

to M&I, regarding its handling of the PCI account, the United States contended

that:

> **M&I Bank fraudulently** entered into deposit account management
> or control agreements on various dates in 2008 that purported to be
> for the benefit of certain PCI investors, but which M&I Bank had no
> intention of performing and in fact failed to perform. The United
> States further contends that M&I Bank failed to appropriately monitor
> the account, through which illicit proceeds from the Ponzi scheme
> conducted by Thomas J. Petters were routinely transferred.[109]

The Justice Department also reserved the right to bring criminal charges against

BMO.[110] This record of fraud and malfeasance is proof of M&I's assistance in the

Ponzi scheme barring both the *in pari* delicto defense and summary judgment.

In fact, M&I played a central role in perpetuating a fraud in which the

staggering sum of more than $40 billion passed in and out of the PCI checking

account at M&I Bank. As former PCI officer Deanna Munson (Coleman) testified,

---

[109] Oct. 12, 2018 Settlement Agreement (emphasis added), attached as Reif Decl.
Ex. 3.

[110] *Id.* at ¶ 3.b.

M&I's willingness to "bend over backwards to help [PCI] out in whatever way . . . they could"[111] made M&I an essential player in the fraud. M&I was so important to the fraud that in 2004 Munson told Tom Petters, Bob White, and Tom Hay that "Petters Company has a very good relationship with M&I Bank" and that it took "10+ years to find a bank that we can work with."[112] In other words, they finally found a bank which would perpetuate the fraud — M&I.[113] The bank's motivation was the prospect of providing loans to Petters to fund his aggressive purchase of companies, including Fingerhut.[114] M&I could have stopped the scheme by refusing to participate in the transactions in the account that were wholly inconsistent with the purported business model of PCI,[115] but the prospect of huge potential bank profits from a high-profile, ersatz business

---

[111] Coleman Dep. Tr. 94:8-10 (Oct. 31, 2017), attached as Reif Decl. Ex. 4.

[112] GECC-BMO-0005239-40, attached as Reif Decl. Ex. 5.

[113] Coleman Dep. Tr. 29:17-20 (Oct. 31, 2017), Ex. 4.

[114] M&I call report (May 16, 2003) ("Tom will need credit with the companies when he moves all accounts to us"), attached as Reif Decl. Ex. 6; Email from Carolyn Moline to Jeanne Crain (Feb. 20, 2008) (in discussing the work M&I would undertake in supervising a deposit control agreement for Petters, Moline wrote: "Chris [Flynn, Petters' M&I banker] feels there is potential for more business"), attached as Reif Decl. Ex. 7; Email from Mark Midtdahl to Lori Groseth (June 6, 2006) (subject line: "FW: Dennis J. Doyle – Acquisition Loan – Petters / Fingerhut site"), attached as Reif Decl. Ex. 8.

[115] BMO Litig. Trust 30(b)(6) Dep. Tr. 29:6-20 (Dec. 15, 2017), attached as Reif Decl. Ex. 9.

mogul on a buying spree fueled the bank's participation.[116]

M&I knew by at least early 2002 exactly how PCI's business was supposed to work when M&I banker Chris Flynn and PCI investor (and Ponzi scheme co-conspirator) Frank Vennes met at Vennes' home and talked about his proposal for M&I to extend a line of credit for his company to invest in PCI's purchase-order-financing transactions (the Ponzi scheme). Vennes provided Flynn with detailed information about the PCI business, including sample PCI transaction documents and an inventory aging report.[117] From that point on, the evidence shows that M&I was well aware of the Petters business plan and the activity in the PCI account.[118]

In 2003 and 2004, M&I received requests from PCI's investors to monitor PCI transactions because they were concerned that their investment returns — ostensibly wired into the PCI account from big box retainers — were being

---

[116] Jambor Dep. Tr. 194:20-195:1 (Nov. 1, 2017) ("well, Tom Petters was a well-known figure in the Twin Cities area."), attached as Reif Decl. Ex. 10.

[117] PCI_S_BMO_011838, attached as Reif Decl. Ex. 11.

[118] M&I call report (Oct. 16, 2002) ("Ed and I met with Deanna to present our proposal for more efficient management of the wire transfer activity and management of excess cash."), attached as Reif Decl. Ex. 12; M&I call report (Oct. 31, 2002) ("Kevin and I met with Tom to get an overview of Petters Company. Discussed Fingerhut purchase. Also met with Brian Smith about a possible purchase of a title company."), attached as Reif Decl. Ex. 13; Email from [Petters' M&I banker] Ed Jambor to Deanna Munson [Coleman] (Apr. 18, 2006) ("I was reviewing you (sic) checking account."), attached as Reif Decl. Ex. 14.

comingled with money belonging to other investors. These requests and M&I's

engagement with them confirms M&I's critical importance to the fraud. For

example, a February 19, 2003 email from Jon Sabes of Opportunity Finance to

M&I employees requesting that "M&I Bank act as a custodian to receive retailer

wire payments and with the further direction of Deanna Coleman at Petters,

forward those monies on to their appropriate bank accounts" is important for

two reasons: (1) Sabes told M&I that the PCI Account received "retailer wire

payments," while M&I **knew** no retailer wired money into the PCI account; and

(2) Sabes told M&I that those retailer wire payments were actually owed to  PCI

investors like himself.[119] Despite receiving Sabes' request to forward payments

that retailers were supposedly making into the PCI Account, M&I never told

Sabes (or any other investor) that no such retailer payments were being wired

into the account.[120] In fact, Petters, Coleman, and M&I banker Ed Jambor met

with Sabes in February 2003. Munson and Petters were officers of PCI and

---

[119] *See* PCI_S_BMO_000693, attached as Reif Decl. Ex. 15; Jambor Dep. Tr. 173:23-
174:4, 213:14-23 (Nov. 1, 2017), Ex. 10; Flynn Dep. Tr. 296:4-7 (Oct. 30, 2017),
attached as Reif Decl. Ex. 16; BMO's Amended Resp. to Requests for Admissions
No. 79, 90, attached as Reif Decl. Ex. 17.

[120] *See* BMO's Resp. to Request for Admission No. 125 at 8-9 ("BMO
admits . . . that no M&I employee informed any Investor of whether or not
money had been wired from a Big Box Retailer into the PCI Account."), attached
as Reif. Decl. Ex. 18.

therefore fiduciaries,[121] an undisputed fact known to Jambor. Yet he sat silent while they lied to Sabes about why retailers were making payments into the PCI account, clearly violating the Minnesota Uniform Fiduciaries Act ("MUFA"), Minn. Stat. § 520.01 *et seq.*

Between February 2003 and October 2004, M&I received multiple requests from PCI and its investors to enter into custodial arrangements called Deposit Account Control Agreements ("DACAs"), in which M&I would oversee payments going into and out of the PCI account.[122] The DACAs served the critical function of placating investors who were asking questions whose answers would have exposed the fraud. The Justice Department found M&I's DACA handling to be fraudulent.

In March 2005, M&I finally implemented an automated account monitoring system for wire transfers called Searchspace, after the Federal Bank of Chicago had warned M&I in 2002 that its fraud alert system was inadequate. Plaintiff's banking expert, Ms. Cathy Ghiglieri, is prepared to testify that Searchspace

---

[121] MUFA defines "fiduciary" as, *inter alia*, "officer of any corporation public or private." Minn. Stat § 520.01 subdiv. 3.

[122] *See* PCI_S_BMO_000693, Ex. 15; PCI_S_BMO_000749-51, attached as Reif Decl. Ex. 19; PCI_S_BMO_000707-18, attached as Reif Decl. Ex. 20; Letter from Howse to Moline (Jan. 27, 2004), Ex. 21; PCI_S_SC_0219001-10, attached as Reif Decl. Ex. 22.

alerted the PCI account "every month after it became operational in March

2005."[123] Her investigation revealed that the reports contained "example after

example of transactions that contained red flags of money laundering or Ponzi

schemes that were ignored by the bank."[124] Those transactions "had no logical

business purpose to justify them when compared to Petters purported business

model."[125] In fact, M&I's employees who investigated the alerts learned that

frequently more than 75% of all money deposited into the account came from

two Petters-controlled entities—Nationwide and Enchanted—that were

supposedly using lender cash to buy electronic goods but were actually

**depositing** lender cash into the PCI account.[126] This was an enormous red flag

entirely inconsistent with the Petters business plan. Yet M&I, well aware of the

---

[123] Ghiglieri Expert Report at 3 (Mar. 7, 2018), attached as Reif Decl. Ex. 23. Ms. Ghiglieri is a former Texas Banking Commissioner with eighteen years of experience as a bank examiner with the federal Office of the Comptroller of the Currency.

[124] *Id.*

[125] *Id.*

[126] Martens Expert Report Ex. 2 (Mar. 14, 2018) ("Summary of Transactions, January 2002 – September 2008"), attached as Reif Decl. Ex. 24. Note that Enchanted and Nationwide paid into the PCI account at M&I nearly $25 billion of the more than $40 billion stolen in the Ponzi scheme. The percentage of money deposited into the PCI account by these two companies varied from month to month. During May and June 2007, for example, the companies' contributions to the PCI account amounted to 78% of all money deposited. Martens Expert Report Ex. 3 (Mar. 14, 2018), attached as Reif Decl. Ex. 25.

fraud, allowed it to continue.

Worse, M&I placed the PCI account on a privileged expedited review status supposedly reserved for the bank's lowest-risk accounts. M&I did this in December 2006 without investigating whether it even qualified for that designation and despite M&I's own Anti-Money Laundering alert system signaling that the PCI account was among the highest risk accounts at the bank.[127] There is no innocent explanation for the bank's action, which amounted to little more than a rubber stamp. The record evidence is indisputable proof that without the bank's assistance, there would have been no Ponzi scheme.[128]

With this record, material facts as to fault are clearly in dispute, which supports the Bankruptcy Court's ruling and bars an interlocutory appeal on

---

[127] Email from Bernita Hile to Mandy Ramlow (Dec. 13, 2006), attached as Reif Decl. Ex. 26; Hile Dep. Tr. 176:7-8 (Jan. 19, 2018) ("I'm going to say I don't recall because I'm not sure exactly what I relied on."), attached as Reif Decl. Ex. 27.

[128] BMO's own discovery-related behavior adds to the balance of harms. None of BMO's cited cases involves a defendant whose discovery abuses caused a court to find "An adverse inference instruction that Defendant intentionally destroyed and failed to preserve Minnesota email backup tapes that it knew were harmful is appropriate." Order Granting Plaintiff's Motion for Rule 37 Sanctions for Defendant's Spoliation of Evidence at 2 (July 1, 2019) (Case No. 19-1756, ECF No. 15-19).

the issue of *in pari delicto*.[129]

## Conclusion

For these reasons, the Court should deny BMO's motion for leave to appeal the Bankruptcy Court's order on summary judgment and should instead set this case for trial.

DATED: July 25, 2019

By: */s/ Thomas L. Hamlin*
Thomas L. Hamlin (#40216)
Michael A. Collyard (#302569)
Michael D. Reif (#0386979)
Peter C. Ihrig (#0390392)
Valerie A. Stacey (#0399416)
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402-2015
Telephone:  612.349.8500
Facsimile:  612.339.4181
thamlin@robinskaplan.com
mcollyard@robinskaplan.com
mreif@robinskaplan.com
pihrig@robinskaplan.com
vstacey@robinskaplan.com

*Counsel for Plaintiff*

---

[129] *See In re SRC Holding Corp.*, 2006 U.S. Dist. LEXIS 95217, at *3 (citing *In re Hanson*, 2004 U.S. Dist. LEXIS 12258, at *9 (if the bankruptcy court's ruling is fact intensive, "review is not proper under 28 U.S.C. § 158(a)(3)")).